UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TINA L. HENDERSON, as personal
representative to the ESTATE OF OTIS
HENDERSON,

                Plaintiff,                Case Number 15-10807
                                            Honorable David M. Lawson

v.

EDWARD JACKSON, and
CITY OF DETROIT,

                Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Detroit police officer Edward Jackson shot decedent Otis Henderson while attempting to

apprehend him to investigate a suspected carjacking. The bullet wound did not kill Henderson (he

died of causes unrelated to this case), and Henderson was not involved in the carjacking that Jackson

was investigating. Henderson's personal representative filed this lawsuit against Jackson and the

City of Detroit seeking damages under 42 U.S.C. § 1983 and the Fourth Amendment and state law

for the shooting. The defendants moved for summary judgment, with Jackson relying on qualified

immunity and the City arguing that the facts do not establish its independent liability. The Court

heard oral argument on April 12, 2016. Because the parties' versions of how the shooting occurred

differ in important respects, and Jackson's qualified immunity defense is fact-bound, summary

judgment for him is not appropriate. However, the plaintiff has not produced evidence that proves

the City's liability under the rule established in *Monell v. Department of Social Services*, 436 U.S.

658 (1978). The Court will grant the City's motion and dismiss the case against that defendant.

I.

According to the defendants, on January 27, 2014 at approximately 10:10 p.m., a black Cadillac STS was carjacked by three or four black males.   The victim reported seeing what he believed was a 2005 black Dodge Durango pull up next to him; one of the men jumped out of the backseat with a handgun and told him to not move.   The group of men robbed the victim and one or more of them stole the Cadillac, driving off in an unknown direction.   Non-defendant officers Dennis Christie and Felisha Gambril radioed the Durango description and that the occupants were possibly armed.   Defendant Edward Jackson and his partner, officer Stephen Kue, received the information while they were stopped at the Victory Inn Motel.   The officers did not have a license plate number for the Durango.

At approximately 10:42 p.m., Jackson and his partner were leaving the motel parking lot, in what Jackson described as a high crime area, when they saw a black Dodge Durango pulling into the parking lot of the motel.   According to Jackson, one of the occupants of the vehicle had something covering his face, although he cannot remember which occupant it was.   Jackson did not include that observation in any of his reports.   Jackson observed a brief exchange between the passengers in the Durango.   Officer Kue illuminated the inside of the vehicle through the front windshield and observed three or four black males in the vehicle.   The Durango immediately turned away as if to evade the officers.   Jackson, who was driving the police car, turned on the oscillating lights and siren in an attempt to effect a traffic stop.   Jackson pursued the vehicle as Kue tried to read the license plate characters, but was unsuccessful because the plate was partially obscured by snow.   Kue reported the pursuit over the department radio and described the vehicle as a "newer" model 2000 Durango.

-2-

During the pursuit, Jackson and Kue heard officer Christie transmit that the Durango matched the description of the vehicle that the carjackers had used and that one of the rear occupants may be armed. Approximately ten other police scout cars joined the pursuit following behind Jackson's vehicle. The pursuit ended after five to ten minutes when the Durango crashed into either a snow bank or another car.

After the crash, Otis Henderson, the plaintiff's decedent, immediately exited the vehicle from the rear passenger seat and fled on foot. According to Jackson, Henderson was holding his waistband as he ran, which gave the impression that he may have a weapon. The 13-second video taken from a nearby store confirms that Henderson's left hand was at his waistband; however, it is not clear whether he is holding a weapon or merely holding up his pants. Jackson jumped out of his vehicle and gave chase.

This is where the stories start to diverge. According to the preliminary complaint record, Jackson asserted that he attempted to identify himself as a police officer several times and ordered Henderson to stop. Henderson ran into an illuminated parking lot toward an alley on the far side of the lot. According to Jackson, as Henderson reached the alley near the trash can, Henderson pointed what appeared to be a gun at him. Jackson fired one shot as Henderson was facing away from him. Unknown to Jackson at that time, the shot hit Henderson in the back right shoulder. Henderson entered the alley with Jackson still chasing.

In his deposition, Jackson maintains that when he entered the alley, he saw Henderson turn in his direction again, although this time Henderson did not appear to point anything at him. In contrast, in his written report, Jackson stated that Henderson again turned and pointed what he believed was a weapon in his direction a second time. Jackson fired another shot, which missed, and

Henderson fell to the ground. Henderson was arrested then and put into handcuffs. Jackson stated that for the most part Henderson was never out of his view.

Henderson was taken to a hospital where he was treated for the gunshot wound and later interviewed by a force investigation team. During the interview, Henderson stated that as soon as the vehicle crashed, he exited the car and began running. Henderson said that he ran because he was on probation. He stated that in the past he had been in a car when somebody else got pulled over and "they gave [him] a year for police contact" and not informing his parole officer. He felt his only way to avoid another sentence was to flee.

For his part, Henderson, who was interviewed by the police after he was shot, stated that he did not hear anything except the gun shots. Henderson contended that he was shot almost immediately after exiting the vehicle and no more than 20 yards from the Durango. Henderson's assertions come from the record of his police interview, which is problematic for the plaintiff (his mother), who has not identified an exception to the hearsay rule that would allow her to offer the statements in evidence. But there is other evidence in the record to support Henderson's version of what happened. The evidence technician assigned to the scene, Raymond Diaz, noted that the events transpired in the back parking lot of a business called the Gold Exchange. Mr. Diaz observed that the blood trail began immediately behind the Gold Exchange and proceeded west toward a dumpster near the back corner of the laundromat on the opposite side of the parking lot. At the dumpster, there was considerably more blood. There also was a large amount of blood where Henderson eventually dropped in the alley behind the laundromat. Mr. Diaz testified that, in his experience, people do not just drop blood immediately when wounded; although it does happen, more often it is delayed. Mr. Diaz's diagrams and testimony suggest that Henderson was 60 feet or more from

-4-

the dumpster, where Jackson alleged he first fired at Henderson.  If the blood behind the Gold Exchange was Henderson's, it would suggest that Jackson could have been as close as 20 yards from where Henderson exited the Durango near the corner of Ashton Street and West Warren Avenue.

Officer Kue's deposition testimony also lends support to Henderson's version of when the first shot was fired.  When Jackson and Kue stopped the vehicle, Jackson jumped out of the driver's seat and pursued Henderson on foot.  Kue exited the vehicle and ran around the scout car to get into the driver's seat.  According to Kue, as soon as he got into the driver's seat, he heard the first gunshot.  The timing of the first shot is further corroborated by Darrio Warren, the driver of the Durango, who stated that Jackson fired at Henderson within two to three seconds after beginning the chase.

Henderson always maintained that he did not have a gun (in his police statement and his description at the hospital), and no firearm was found at the scene, after an extensive search. Henderson alleged that he never looked back, he never raised his arm toward Jackson, and he did not throw anything away.  In fact, when he learned that a camera may have captured part of the foot chase, Henderson encouraged the officers to check the video recording, because it would verify his version of the events.  According to Henderson, he was shot almost immediately after exiting the Durango.  After he ran into the alley, Jackson shot at him again and he dropped to the ground.  Once he was on the ground, Henderson alleged that he was hit in the face repeatedly by the officers.  All other occupants of the Durango were apprehended without the use of force and without incident.

It was later determined that the Durango had not been involved in the earlier carjacking. Henderson later was charged and pleaded guilty to resisting arrest.

The plaintiff (Henderson's personal representative) filed an amended complaint in state court alleging five counts against defendant Jackson and one count against defendant City of Detroit. She alleges against Jackson excessive force under section 1983 (Count I); intentional infliction of emotional distress (Count II); state constitutional claims (Count III); battery (Count IV); and gross negligence (Count V). The plaintiff alleges that the City is liable to Henderson's estate for failing to train its police officers properly in the use of deadly force, and therefore was deliberately indifferent to Henderson's constitutional rights (Count VI). The defendants removed the case to this Court.

In their summary judgment motion, the defendants argue that the plaintiff has not shown that the City has adopted a policy, custom, or practice that violated Otis Henderson's rights, defendant Jackson is entitled to qualified immunity against the plaintiff's federal claims, and the plaintiff's state law claims based on the Michigan constitution, common law gross negligence, and intentional infliction of emotional distress are not supported by the evidence. They also contend that the battery claim is barred by Henderson's wrongful conduct.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

-6-

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

-7-

### A.  Timeliness of the Motion

As an initial matter, the plaintiff argues that the Court should not consider the merits of the summary judgment motion because the defendants filed it after the January 4, 2016 deadline established by the Case Management and Scheduling Order.  That argument ignores the Court's discussion with the lawyers about form and filing.  The defendants actually filed two motions for summary judgment on January 4.  However, at a status conference on January 7, 2016, the Court pointed out that under the local rule, only one motion was permitted (absent leave of court), and it appeared that the defendants attempted to circumvent the page limitation by filing two motions.  *See* E.D. Mich LR 7.1(c)(3).  The Court admonished defense counsel and suggested that it may be in his best interest to withdraw the motions and resubmit a single conforming motion.  Defense counsel expressed concern about the filing deadline.  The Court, in the presence of plaintiff's counsel, stated that as long as the defendants resubmitted promptly, the Court would consider their motion.  The defendants resubmitted a conforming motion five days later on January 12, 2016.

Plaintiff's counsel was present when the Court admonished defense counsel and knew the circumstances surrounding the late filing.  The Court, therefore, is puzzled by his argument.  In all events, it has no merit.

### B.  Municipal Liability

The City argues, without much elaboration, that the plaintiff has not offered evidence of the City's own liability for the plaintiff's federal claims.  The paucity of the argument perhaps is due to the lack of specific detail in the amended complaint itself, which alleges generalities (that the City failed to train its officers properly in the use of deadly force, Jackson exhibited a pattern of conduct that showed a need to train him, the City had an unconstitutional policy regarding use of force on

fleeing suspects, the City did not properly supervise Jackson) without any actual facts to back them up. In her response to the summary judgment motion, the plaintiff acknowledges that the City has a foot pursuit policy (with which she finds no fault), but she says that Jackson violated it. She also contends that Jackson did not receive "excessive force training" twice each year per the City's own policy, and that the City acquiesced in Jackson's past constitutional violations by not disciplining him for earlier citizen complaints. The plaintiff also adds the argument that the City violated a provision of a consent judgment with the United States Department of Justice that required the police department to equip its patrol cars with in-car video cameras.

It ought to be clear by now that a "municipality cannot be held vicariously liable under section 1983 for an injury inflicted by its employees or agents." *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 694 (1978). Instead, "under § 1983, local governments are responsible only for 'their *own* illegal acts'" through its enactment or adoption of an unconstitutional policy, custom, or practice. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original ). The Sixth Circuit has explained that "[t]he [city's] official policy or custom 'must be the moving force of the constitutional violation' to establish the liability of a government body." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

-9-

The plaintiff's argument that the city failed to meet its obligation under the consent judgment to maintain operable in-car video cameras does not save her *Monell* claim against the City. There are no allegations to support this argument in the complaint. A plaintiff may not expand claims and assert new theories in response to a summary judgment motion. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing cases).

### 1. Failure to Train

Inadequate training may serve as the basis for municipal liability under section 1983 where it "'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390.

*Brown* provides substantial guidance on the question presented here. In that case, police officers used tasers on a suspect by firing the tasers at his chest. The suspect died shortly after being struck with the tasers. The company that provided the tasers to the police department had sent updated training materials prior to the incident which included materials that informed officers to avoid chest shots when possible because of the risk of affecting the heart. However, the city defendant had trained officers using outdated materials, which instructed officers to avoid the head and neck when using the tasers. The court held that to impose liability on a municipality, the plaintiff must show "'(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [City's] deliberate indifference; and (3) that the

-10-

inadequacy is closely related to or actually caused the plaintiff's injury.'" *Brown*, 814 F.3d at 463 (quoting *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

The court found that the first element of an inadequate training claim was met easily because the defendant was using outdated materials and therefore "did not adequately train its officers how to use a taser." *Id.* at 463. Here, the plaintiff argues that the City did not train its officers adequately because it failed to conduct regular training on use of force and foot pursuit procedures. But the plaintiff has not identified any deficiency in the training program itself; rather, the plaintiff challenges only the frequency of the training. However, Jackson received use of force training in 2009, 2010, 2012, and 2013. Although it appears that he did not receive the training in 2008 and 2011, he did receive training in each of the two years immediately preceding the events giving rise to this action. As part of the use of force training, he was to receive foot pursuit training. When asked if he was familiar with the foot pursuit policy, Jackson replied that he was, although he did not know it so well that he could recite the policy verbatim. Indeed, all of the officers deposed acknowledged familiarity with the foot pursuit policy and asserted that they received 40-hour blocks of training annually. That evidence remains uncontested. The plaintiff has not met the first element of an inadequate training claim because she has not shown how the policies themselves are inadequate or how the frequency of the actual training is not a sufficient amount of training.

As to the second element, the *Brown* court found that deliberate indifference can be found by a "'failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction, as would be the case, for example, if a municipality failed to instruct its officers in the use of deadly force.'" *Id.* at 463 (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)) (some internal marks omitted); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1345

(6th Cir. 1994).  The court held it foreseeable that officers would discharge their tasers at suspects' chests because of the lack of proper training and that it may result in the death of a suspect, which it ultimately did.  *Brown*, 814 F.3d at 463.  By contrast, in *Berry*, the Sixth Circuit reversed a money judgment against the City of Detroit for failure to train police officers on the use of deadly force and failure to discipline.  The *Berry* court found that police officers received significant training on the use of force in the police academy and continued to receive 40 hours of in-service training annually. *Berry*, 25 F.3d at 1347.  The *Berry* court concluded that the City of Detroit's written deadly force policies were constitutional and that the policies were well known to all members of the police department.  *Ibid.*

Here, as in *Berry*, the City of Detroit had policies in place addressing the use of force and how to conduct a foot pursuit of a suspect.  The plaintiff has not alleged that the policies themselves are unconstitutional.  Instead, she argues that the officers were not trained in those policies with enough frequency.  The foot pursuit policy requires officers to be trained bi-annually, which the city appears to have not done.  But the plaintiff has not shown why annual training is insufficient. Furthermore, the plaintiff has not explained why the consent judgment with the Department of Justice should be controlling in this case.  Any violation of the consent judgment is between the City of Detroit and the Department of Justice.

The small sample of officers who were deposed knew the policies, and with the exception of Jackson, all followed the use of force and foot pursuit policies.  However, even if Jackson was insufficiently trained, that alone would not make the city liable because his "shortcomings may have resulted from factors other than a faulty training program."  *City of Canton*, 489 F.3d at 390-91. There is nothing in the record to suggest why Jackson deviated from the foot pursuit policy, nor has

-12-

the plaintiff shown a pattern or practice of training failures that amounts to a deliberate indifference to the constitutional rights of citizens. The City has policies on the use of force and foot pursuit procedures and conducts regular training. Therefore, it was not foreseeable that officers, such as Jackson, who receive annual training, would ignore the training and that doing so would lead to the types of injuries suffered by Henderson.

In the failure to discipline context, the plaintiff must show "a history of widespread abuse that has been ignored by the City." *Berry*, 25 F.3d at 1354. The plaintiff only alleges that the city failed to discipline Jackson properly. A single alleged failure by the city does not amount to widespread abuse amounting to deliberate indifference. *Ibid.* The plaintiff has not demonstrated that the City was deliberately indifferent by failing to train or discipline its police officers.

As to the third element, the plaintiff has not shown how the city's failure to train was the cause of Henderson's injuries. As noted above, the City conducts regular training, and the plaintiff has not pointed to any defect in the training itself, except for its frequency. Unlike in *Brown*, where the plaintiff in that case demonstrated that the city had ignored updated training materials that reasonably led to the harm suffered by the plaintiff, plaintiff Henderson in this case has not identified defective material or shown that Jackson did not receive sufficient training. The plaintiff has also not satisfied the third element of an inadequate training claim.

Taking the facts in the light most favorable to the plaintiff, no reasonable jury could conclude that the City of Detroit failed to train its police officers on the use of force and foot pursuit procedures. Nor could a jury find that the City failed to discipline its officers based on the alleged failure to discipline a single officer. Moreover, neither of the alleged inadequate training programs can be seen as the moving force behind the alleged constitutional violation.

-13-

2.  Failure to Discipline

The plaintiff argues that the City of Detroit acquiesced to the violation of citizens' rights by not completely investigating all of the complaints against defendant Jackson.  The Sixth Circuit has recognized that a municipality may be held liable under section 1983 for its deliberate indifference evidenced by its *inaction*.  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  To state a municipal liability claim under an inaction theory, the plaintiff must establish:

> (1) the existence of a clear and persistent pattern of illegal activity;
> (2) notice or constructive notice on the part of the defendant;
> (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Ibid.* (internal marks omitted) (citing *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996)).

In *Berry v. City of Detroit*, the court noted that "deliberate indifference" in this context exists only upon "a showing of a history of widespread abuse that has been ignored by the City."  25 F.3d at 1354 (citing *City of Canton*, 489 U.S. at 397).  Here, the plaintiff has failed to come forward with sufficient evidence of failure to discipline or respond to citizen complaints.  The entirety of the plaintiff's argument that the City of Detroit failed to investigate defendant Jackson amounts to the following sentence: "Further, Defendant City of Detroit has demonstrated an acquiescence and a conscious disregard to violating citizens' rights by not completely investigating all of the complaints against Defendant Jackson. . . ."  Response at 16.  The sole basis for this assertion is the force investigation report that states Jackson "had 35 citizen's complaints with 86 areas of concern, 4 service, 13 force, 4 property, 3 search, 3 harassment, 6 arrest, 1 entry, 31 procedure, 21 demeanor

-14-

of which the following findings revealed 42 non-sustained, 9 exonerated, 5 unfounded, 27 pending and 3 sustained.  The 27 pending date back to 2012." *Id.* at 9.  There is no indication whether any of the complaints against Jackson were or were not investigated.  And the only suggestion that the number of complaints might be unusually high is in officer Willie Duncan's deposition, where he said that *he thought* Jackson had more citizen complaints than average.   The plaintiff's argument is conclusory, not fact based, and therefore does not establish a triable fact issue for a failure to discipline theory against the City.

### C.  Qualified Immunity

Jackson argues that he is entitled to qualified immunity from suit because he had received information that suspects in a vehicle that matched Henderson's Durango had been involved in a serious crime of violence (carjacking), and when Jackson was pursuing Henderson on foot, Henderson pointed what appeared to be a weapon at him which put him in fear for his life.  The plaintiff says that Jackson shot Henderson, an unarmed man, in the back as Henderson was attempting to flee.

Section 1983 claims are subject to the affirmative defense of qualified immunity, which "shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When the qualified immunity defense is raised, the plaintiff must present evidence at the summary judgment stage of the case that shows "that (1) the defendant violated a constitutional right and (2) that right was clearly established." *Ibid.* (citing *Quigley*, 707 F.3d at 680).

-15-

An officer is entitled to qualified immunity if "a reasonable officer could have believed" his or her actions were lawful "in light of clearly established law and the information the [officer] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 (1987). However, to succeed on a summary judgment motion, the officer must be prepared to accept the plaintiff's version of the facts and all inferences that could be drawn reasonably from those facts in the record. *See Booher v. N. Ky. Univ. Bd. of Regents*, 163 F.3d 395, 396 (6th Cir. 1998) (asserting that "a defendant seeking to take an interlocutory appeal from the denial of qualified immunity 'should be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the case'" (quoting *Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998))); *see also McDonald*, 814 F.3d at 813-14 (criticizing the defendant police officer for "barely even feign[ing] an attempt at accepting the plaintiffs' version of the facts . . . and instead propound[ing] his own version of the facts and the inferences that he would draw from them"). Here, Jackson has ignored the plaintiff's assertions of the events and the evidence that supports them.

As an initial matter, much of the plaintiff's version of the events comes from Henderson's own statement to the police. Detroit police investigator Tonique Roche prepared a force investigation report 2.5 months after the shooting. Part of the force investigation report included a synopsis of the plaintiff's decedent's oral statement made to police officers in the hospital approximately six hours after the shooting. The statement was transcribed and the plaintiff relied on the statement in her opposition to the defendants' motion for summary judgment.

The force report is an out-of-court statement, and therefore is subject to a hearsay objection. The plaintiff has not made a case for admissibility of the force report under any hearsay exception (business records, Fed. R. Evid. 803(6), or official reports Fed. R. Evid. 803(8), perhaps, are

-16-

possibilities).  But even if the report were admissible, Henderson's statements incorporated into that report offered to prove that what he said was true are vulnerable to a hearsay objection.  *See Almond v. ABB Indus. Sys., Inc.*, No. 95-707, 2001 WL 242548, at *7 (S.D. Ohio Mar. 6, 2001) (explaining that hearsay embedded in a document must have its own exception to qualify for admissibility, per Federal Rule of Evidence 806, and an out-of-court statement by a party is still hearsay unless the statement is offered *against* that party), *aff'd sub nom. Almond v. ABB Indus. Sys., Inc.*, 56 F. App'x 672 (6th Cir. 2003).  "A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."  *Sperle v. Mich. Dept. of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002); *see also Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003).

Even without Henderson's own statements, however, fact questions preclude summary judgment in Jackson's favor on his qualified immunity defense.  As a general rule, the constitutional right to be free from excessive force was a clearly established right at the time of Henderson's arrest. But "[i]t is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (internal quotation marks and citation omitted).

The Sixth Circuit has held that "[a]s a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers."  *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008) (citing *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005).  "Rather, the use of deadly force is only constitutionally permissible if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. . . .'"  *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  The Fourth Amendment protects all citizens from the use of excessive force — deadly

-17-

or not — by law enforcement officers in the course of an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (U.S. 1989). As noted above, there is evidence from which a jury could conclude that Henderson was unarmed, and that Jackson shot him in the back very shortly after Henderson alighted from the Durango. Therefore, the plaintiff here has shown a well-established constitutional right to be free from excessive force during an arrest.

The reasonableness of Jackson's conduct is subject to question. The Sixth Circuit "has highlighted three factors of particular relevance in assessing the reasonableness of an officer's use of force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008) (citing *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006)).

The crime Jackson was investigating was carjacking, a serious felony. However, Henderson's actual conduct amounted to nothing more than resisting arrest by fleeing from police officers. In *Garner*, the Supreme Court noted that "[i]n the few States that do outlaw flight from an arresting officer, the crime is only a misdemeanor," which avoids the anomaly "of automatically transforming every fleeing misdemeanant into a fleeing felon." *Tennessee v. Garner*, 471 U.S. 1, 11 n.9 (1985). The Court noted that it was not persuaded that "shooting nondangerous fleeing suspects is so vital as to outweigh the suspect's interest in his own life." *Id.* at 11.

The second and third factors also weigh in the favor of the plaintiff. Often what triggers the use of force by police officers is a suspect forcibly resisting arrest. *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) (citing *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). In *Burchett*, the court found that the force used to handcuff the suspect was reasonable because the suspect was

-18-

twisting and turning when the officers attempted to handcuff him. *Burchett*, 310 F.3d at 944. Here, however, Henderson was unarmed and running away from the officers and was not posing a threat to them or others. Nor was Henderson forcibly resisting arrest; rather he was running away. The defendants argue that Jackson's actions were reasonable because he believed that Henderson had pointed a gun at him as he was fleeing. But that version of the events does not account for the plaintiff's evidence, discussed earlier, that Henderson did no such thing. The plaintiff posits that Jackson, without warning, fired at an unarmed man who was running away from officers, and there is evidence to support that contention.

Fact questions presented by the record preclude the qualified immunity defense at this summary judgment stage of the case.

### D.  State Law Claims

Defendant Jackson argues that the plaintiff has not identified evidence to support her state law claims. He also contends that all of the state tort claims — intentional infliction of emotional distress, battery, and gross negligence — are barred by the wrongful conduct rule.

### 1. Wrongful Conduct Rule

Under Michigan common law, when a plaintiff commences a tort action to recover for injuries that are "based, in whole or in part, on his own illegal conduct," the claim generally is barred. *Orzel by Orzel v. Scott Drug Co.*, 449 Mich. 550, 557, 537 N.W.2d 208, 212 (1995). In *Orzel*, the plaintiff alleged that a pharmacy negligently filled a facially valid prescription for a controlled substance to which the plaintiff became addicted, with consequent mental illness and loss of working capacity. The plaintiff admitted that he also acquired the drug from other sources, including illegal sources. The Michigan Supreme Court believed that "courts should not lend their

aid to a plaintiff who founded his cause of action on his own illegal conduct," *id.* at 559, 537 N.W.2d at 213, and affirmed the trial court's dismissal.

In 2000, the Michigan legislature codified the rule in Michigan Complied Laws § 600.2955b. That statute bars claims for "bodily injury or death" caused by the plaintiff's "commission, or flight from the commission, of a felony," or his "acts or flight from acts that the finder of fact in the civil action finds, by clear and convincing evidence, to constitute all the elements of a felony." Mich Comp. Laws § 600.2955b(1)(a)-(b). The statute contains an exception that allows recovery when such injuries "resulted from force." *Id.* § .2955b(2) But that exception does not apply if the defendant "[u]sed a degree of force that a reasonable person would believe to have been appropriate to prevent injury to the defendant or to others," or that was "appropriate to prevent or respond to the commission of a felony." *Id.* § .2955b(2)(a)-(b).

The Sixth Circuit has noted that there is an open question whether the statute abrogated the wrongful-conduct rule and therefore found it prudent to address both the common law rule and Michigan statutory law. *See Chorazyczewski v. Costco Wholesale Corp.*, 627 F. App'x 515, 517 (6th Cir. 2015). Another judge in this district has held that the statute "displaces the common law rule." *Peterson v. Taliaferro*, No. 12-13729, 2013 WL 6328826, at *3 (E.D. Mich. Dec. 5, 2013). This Court agrees. The key difference between the common law rule and the Michigan statute is the consideration of the reasonableness of the defendant's conduct. As the *Peterson* court noted "the statutory rule is effectively of little worth as long as the common law rule continues to stand. If courts are constrained to apply the longstanding common law rule in lieu of the statutory rule, suits would be precluded before a determination of reasonableness is necessary." *Peterson*, 2013 WL 6328826, at *3. In other words, if a defendant's actions are deemed reasonable, the suit would be

-20-

barred under both rules. *Ibid.* If, however, a defendant's actions are deemed unreasonable, the common law rule would bar the suit before reaching reasonableness under the statute. *Ibid.*

The defendant argues that Henderson was injured because he pointed a "suspected weapon" at officer Jackson, and then fled from police, as evidenced by his guilty plea to resisting arrest. Jackson reasons that because the plaintiff's claim is based on wrongful conduct, her state tort claims are barred. That reasoning is flawed under both the common law rule and the statute.

First, there is no evidence that Henderson pointed a weapon at Jackson. Jackson never saw an actual firearm, and no gun was found at the scene. Second, it is true that Henderson was committing a felony when he was fleeing from the police. *See* Mich. Comp. Laws § 750.81d(1) (punishing as a two-year felony conduct consisting of, among other things, "resist[ing], obstruct[ing], [or] oppos[ing] . . . a person who the individual knows or has reason to know is performing his or her duties"). However, "[t]he mere status of a plaintiff as a lawbreaker at the time of his injury is not sufficient of itself to bar him from resort to the courts." *Manning v. Noa*, 345 Mich. 130, 136, 76 N.W.2d 75, 78 (1956). Instead, the plaintiff's injury must be "a proximate result of committing an illegal act." *Orzel*, 449 Mich. at 565, 537 N.W.2d at 215. As the plaintiff points out, Henderson's flight from the vehicle did not proximately cause his injuries; rather, it was Jackson's firing of his weapon. The plaintiff's status as a lawbreaker alone is not a substantial causal connection to being shot in the back. *See Manning*, 345 Mich. at 136, 76 N.W.2d at 78. "The unlawful act must be at once the source of both his criminal responsibility and his civil right." *Orzel*, 449 Mich. at 565, 537 N.W.2d at 215. Henderson's flight was not the source of injuries.

Moreover, the Michigan statute allows redress for the unreasonable use of force even if a party is guilty of a felony or is in flight from such a felony. *See* Mich. Comp. Laws § 600.2955b(1)-

-21-

(2). Even if Henderson had been the suspected carjacker, accepting the facts in favor of the nonmoving party, Michigan law would not bar the plaintiff's recovery in tort. The plaintiff alleges that once the vehicle he was riding in stopped, he fled. He ran from the vehicle empty handed and never looked back. Within a few seconds and after running no more than 20 yards, he was shot in the back by officer Jackson. Jackson disputes this sequence of events, but as noted above, there is evidence in the record that supports the plaintiff's version of the events. Under the plaintiff's version, it would be unreasonable for an officer to resort to deadly force when a crime suspect is fleeing and made no threatening actions against the officer. On this record, a jury could conclude that Jackson's shooting an unarmed fleeing suspect was an unreasonable, excessive, and inappropriate response to Henderson's flight.

The wrongful-conduct rule does not preclude the plaintiff's state law tort claims.

### 2. State Constitutional Claims

The plaintiff brought a damages claim against defendant Jackson based on the due process, equal protection, and search and seizure provisions of the Michigan constitution. The defendants challenge the merits of those claims, and the plaintiff in her answer to the motion has conceded that they must be dismissed, as she must. *See Jones v. Powell*, 462 Mich. 329, 335-37, 612 N.W.2d 423, 426-27 (2000) (holding that there is no money damage remedy for violation of the Michigan constitution in a suit against individual governmental employees); *Lavey v. Mills*, 248 Mich. App 244, 250, 639 N.W.2d 261, 265 (2001) (stating that "no inferred damages remedy for a violation of a state constitutional right exists against individual government employees"). Count III of the amended complaint, therefore, will be dismissed.

3.  Intentional Infliction of Emotional Distress

Defendant Jackson asserts that the claim for intentional infliction of emotional distress (IIED) is not sustained by the evidence presented so far, and it should be dismissed.  The Court agrees.

Although the Michigan Supreme Court has not yet recognized the tort of intentional infliction of emotional distress, the Michigan Court of Appeals has consistently accepted it.  *Mroz v. Lee*, 5 F.3d 1016, 1018 (6th Cir. 1993) (collecting cases).  "Under Michigan law, a *prima facie* case for intentional infliction of emotional distress requires the following elements: '(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress.'" *Ruffin-Steinback v. dePasse,* 267 F.3d 457, 464 (6th Cir. 2001) (quoting *Andrews v. Prudential Secs., Inc.,* 160 F.3d 304, 309 (6th Cir. 1998)).  "The outrageous conduct requirement is satisfied only by conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Liability arises, moreover, only where the distress inflicted is so severe that no reasonable man could be expected to endure it."  *Andrews*, 160 F.3d at 309 (internal citations and quotations omitted).  "It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss."  *Miller v. Currie*, 50 F.3d 373, 377-78 (6th Cir. 1995).

The plaintiff has presented ample evidence that Jackson intended to cause *physical* injury upon Henderson, but there is no evidence that the defendant intended to inflict emotional trauma. Moreover, Jackson's conduct, viewed most favorably to the plaintiff, does not rise to the level of outrageousness customarily thought to be necessary to establish this tort.  The plaintiff has not cited

-23-

a single case in which a police officer's excessive force — even the use of deadly force — has been found to support an IIED claim.  In fact, Michigan law suggests the contrary.  *See VanVorous v. Burmeister*, 262 Mich. App. 467, 687 N.W.2d 132, 143 (2004), *overruled on other grounds by Odom v. Wayne Co.*, 482 Mich. 459, 760 N.W.2d 217 (2008).  Count II of the amended complaint will be dismissed.

### 4.  Gross Negligence

The plaintiff brings a claim of gross negligence based on defendant Jackson's alleged use of excessive force, which under state tort law would amount to a battery.  The defendants respond by arguing there is no tort of assault and battery by gross negligence citing *Sudul v. City of Hamtramck*, 221 Mich. App. 455, 458, 562 N.W.2d 478, 479 (1997).  The plaintiff points out correctly that *Sudul* concerns jury instructions that conflated the concepts of gross negligence and assault and battery and offers little guidance on the plaintiff's claim.  Both parties, however, failed to recognize that the Sixth Circuit "has rejected attempts to transform claims [under state law] involving elements of intentional torts into claims of gross negligence." *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011).  Under Michigan law, intentional tort claims cannot be transformed into alternative claims of negligence.  *See VanVorous*, 262 Mich. App. at 467, 687 N.W.2d at 143 (finding that plaintiff failed to state a claim upon which relief could be granted for claim of gross negligence where plaintiff alleged intentional tortious conduct); *see also Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007) (rejecting a gross negligence claim against a defendant officer because it was "undoubtedly premised on the intentional tort of battery" where it was based on a shooting that resulted in death).

-24-

It is true that a plaintiff is entitled to plead in the alternative.  But here, the facts presented do not allow for the possibility of finding Jackson responsible for grossly negligent conduct. It is beyond dispute that his actions — reasonable or not — were intentional.  Count V of the amended complaint will be dismissed.

III.

The plaintiff has not sustained a claim for municipality against the City of Detroit. Defendant Edward Jackson is not entitled to qualified immunity against the plaintiff's federal claim at this stage of the proceedings because fact questions preclude summary judgment.  The plaintiff's claims for state constitutional violations, intentional infliction of emotional distress, and gross negligence must be dismissed, for the reasons discussed above.  The case will proceed to trial on the counts alleging civil rights violations under 42 U.S.C. § 1983 and battery under state law.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #25] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts II, III, V and VI of the amended complaint are **DISMISSED WITH PREJUDICE**.  The amended complaint is **DISMISSED** as to the City of Detroit.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the parties must submit their proposed joint pretrial order to chambers **on or before June 8, 2016**.  *See* E.D. Mich. LR 16.1(f).

s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge

Dated:  June 3, 2016

-25-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 3, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI